# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

| | | |
|---|---|---|
| ROBERT D. REEVE, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | CV 211-208 |
| | * | |
| JANET NAPOLITANO, Secretary, | * | |
| Department of Homeland Security, | * | |
| | * | |
| Defendant. | * | |

## ORDER

Presently before the Court is Defendant's Motion for Summary Judgment. See Dkt. No. 18. Upon due consideration, Defendant's motion is **GRANTED.**

## I. FACTUAL BACKGROUND

This action is predicated on Defendant's alleged retaliatory termination of Plaintiff's temporary duty assignment. See Dkt. No. 1. The relevant facts are taken principally from the parties' Statements of Material Facts and responses thereto. Dkt. Nos. 18-1, 24-1. Pursuant to Federal Rule of Civil Procedure 56(e) and Local Rule 56.1, all material

1

AO 72A
(Rev. 8/82)

facts not specifically controverted by specific citation to the record are deemed admitted, unless otherwise inappropriate.

Where the parties offer conflicting accounts of the events in question, this Court draws all inferences and presents all evidence in the light most favorable to Plaintiff.  See Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1318 (11th Cir. 2012) (citing Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011)).

## A. Plaintiff's First TDY to FLETC

On July 24, 2007, Plaintiff began a series of Temporary Duty Assignments ("TDYs") at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia.  Dkt. No. 24-1 ¶ 1.  Plaintiff served as a Firearms Instructor in the Firearms Division.  Id. ¶¶ 3-4.

A TDY is scheduled to last for a fixed period of time, typically just under one (1) year.  Dkt. No. 24-20, at 26.  No TDY is guaranteed to last for the entire scheduled period.  Dkt. No. 18-3, at 27.

Plaintiff's salary was based on the General Schedule ("GS").  Dkt. No. 24-19 ¶ 102.  While at FLETC, Plaintiff had a GS-13 pay grade.  Id.

B. Negative Student Evaluations

   1.   September 2007 Negative Student Evaluations

   In September 2007, multiple FLETC students submitted negative student evaluations related to Plaintiff's instruction. Dkt. No. 24-1 ¶ 10. Specifically, multiple students submitted negative evaluations regarding Plaintiff's CBP 728A class. Dkt. Nos. 18-4, 18-5. These student evaluations stated that Plaintiff intimidated and yelled at students. Id. The evaluations also described Plaintiff's use of profanity, unprofessional conduct and comments, and refusal to answer student questions or assist students. Id.; see also Dkt. No. 18-2, at 32-33, 47.

   Students also submitted negative evaluations regarding Plaintiff's FLETC-AMB 703 class. Dkt. No. 18-6. These students described Plaintiff's unprofessional conduct and his poor preparation and instruction. Id.; see also Dkt. No. 18-2, at 32-33. They also stated that Plaintiff ridiculed students, was "antagonistic and arrogant," "made the course unenjoyable[,] and [created] a hostile work environment." Dkt. No. 18-6.

3

2.  September 2007 Investigation and Counseling

In September 2007, FLETC Branch Chief Fred Allen was Plaintiff's immediate supervisor. Dkt. No. 18-7, at 9. FLETC Firearms Division Chief, Walter Koran, informed Allen about the students' negative evaluations of Plaintiff. Id. at 8-9. Allen conducted an investigation into the negative evaluations. Dkt. No. 24-8, at 10. He uncovered only "he said, she said" allegations and found no "hard evidence."[1] Dkt. Nos. 18-7, at 12-13; 24-7, at 10. However, Allen noted that, when a student evaluation is written in long-hand (as these evaluations were), there is usually "some truth to it." Dkt. No. 24-8, at 10-11.

Allen discussed the student critiques with Plaintiff. Dkt. No. 18-7, at 9. Allen told Plaintiff that "[he] did nothing wrong." Dkt. No. 24-20, at 44. Allen also provided Plaintiff with verbal counseling and a "verbal warning." Dkt. Nos. 18-7, at 9, 12-13; 24-8, at 11. Specifically, Allen told Plaintiff that there would be "zero tolerance for the future." Dkt. Nos. 18-7, at 13; 24-8, at 11. Allen did not tell Plaintiff that he was "completely cleared" of wrongdoing. Dkt. No. 18-7, at 37.

─────────────────────────

[1] If Allen found "hard evidence," Plaintiff's TDY "probably would have been terminated at th[at] time." Dkt. No. 24-8, at 14.

4

Nor did Allen tell Plaintiff that the negative evaluations would "never come up again." Id. at 38. In fact, the incident could be used at a later time as part of "progressive disciplinary action." Id. Allen reported his findings and counseling of Plaintiff to Koran. Dkt. No. 24-8, at 12.

Also in September 2007, Customs and Border Patrol ("CBP") Assistant Director Dorothy Schiefer learned about these negative student evaluations. Dkt. No. 24-9, at 4-8. After reading the evaluations,[2] D. Schiefer discussed them with Plaintiff. Id. at 8. She observed that Plaintiff appeared to sincerely want to give the students the best possible training. Id. at 9. She told Plaintiff that "[he] did nothing wrong." Dkt. No. 24-20, at 44. Because these were Plaintiff's first set of negative student critiques, she provided Plaintiff with verbal counseling and made suggestions regarding how Plaintiff might change his interactions with students. Dkt. No. 24-9, at 8-10. In D. Schiefer's opinion, "[c]ritiques over a period of time may tell you something, but one set of critiques from one class should

---

[2] D. Schiefer's initial reaction was that, if the critiques were true, Plaintiff's TDY would be terminated. Dkt. No. 24-9, at 8.

AO 72A
(Rev. 8/82)

not be gospel." Id. at 8.  She noted that "students exaggerate" and "know that they can get an instructor in trouble."  Id.

    3.    December 2007 Negative Student Evaluations

    In December 2007, students again submitted negative evaluations regarding Plaintiff's instruction.  Dkt. No. 18-6, at 13-14.  These student evaluations described Plaintiff's unprofessional manner towards students, including his actions, comments, and tone of voice when interacting with students.  Id. These evaluations also expressed concern that Plaintiff's conduct negatively affected safety.  Id.

AO 72A
(Rev. 8/82)

4.  April 2008 Negative Student Evaluations[3]

In February 2008, students submitted negative evaluations regarding Plaintiff's AMB 804 class. See Dkt. No. 18-2, at 83; see also Dkt. Nos. 18-9, at 3; 24-16, at 12. Specifically, ten (10) out of twenty (20) students stated that Plaintiff had a volatile personality and was unprofessional. Dkt. No. 18-9, at 3. Plaintiff's supervisors conducted an investigation into Plaintiff's repeated receipt of negative student evaluations. Id. On April 1, 2008, Plaintiff's supervisors concluded their investigation. Id. The supervisors decided to terminate Plaintiff's TDY. Id.

_____

[3] The Court notes that Plaintiff repeatedly asserts that he received no negative student evaluations after September 2007. Dkt. Nos. 24-1 ¶¶ 17, 130; 24-4 ¶¶ 8-9. However, the evidence does not support this assertion. Dkt. No. 24-1 ¶ 130. In particular, Plaintiff discusses such critiques in his deposition. Dkt. No. 24-20, at 84. There are emails from April 2008 that explain how supervisors resolved negative student critiques related to Plaintiff's instruction. Dkt. No. 18-9. Moreover, Plaintiff admits that he signed a letter in April 2008 that acknowledged that he was counseled and that contained terms for Plaintiff's continued employment. Those terms specifically related to the receipt of additional negative student critiques. Id.; Dkt. No. 24-1 ¶ 130. Consequently, Plaintiff's own evidence suggests that there were additional negative student evaluations after September 2007.

The Court further notes that Plaintiff appears to draw a distinction between negative student critiques at FLETC and negative student critiques as part of FLETC's Coordinator Training Program. See Dkt. Nos. 24-1 ¶ 132; 24-4 ¶¶ 8-9. However, it is unclear how this distinction relates to Plaintiff's Complaint. At all times relevant to his Complaint, Plaintiff had TDYs to FLETC. Plaintiff's suit specifically relates to the termination Plaintiff's second TDY. See Dkt. No. 1. Therefore, the Court finds that all performance appraisals received during Plaintiff's TDYs are relevant.

On April 2, 2008, Plaintiff and his supervisors met to discuss issues with Plaintiff's job performance. Dkt. Nos. 18-2, at 78-79; 18-7, at 2-3. After this meeting, Plaintiff's supervisors decided that Plaintiff's TDY would continue. However, Plaintiff's continued service was contingent upon Plaintiff receiving no additional negative student critiques. Dkt. No. 18-9, at 2-3.

Also on April 2, 2008, Plaintiff signed a written statement. See Dkt. No. 18-10. In his statement, Plaintiff (1) confirmed that his continued detail was contingent upon receiving no further negative critiques, (2) agreed that, if he received multiple negative student critiques, he would acknowledge responsibility for his actions, and (3) agreed that conspiracy theories would not justify multiple negative critiques. See id.

Firearms Instructor James Schiefer attended the April 2 meeting. J. Schiefer told Plaintiff's supervisors that he observed Plaintiff in the AMB 804 course. Dkt. No. 24-16, at 9. During the course, J. Schiefer observed only one (1) incident between Plaintiff and a student. Dkt. No. 24-17. The student provoked that incident through disrespectful behavior. Id. J. Schiefer also stated that Plaintiff "did not deserve what he

8

got in [the student] critiques." Dkt. No. 24-16, at 10. He further noted that Plaintiff "did a good job" and that "new instructors tend to be very passionate." Id. J. Schiefer believed that Plaintiff received multiple negative student critiques in the AMB 804 course because the class "took on the problem" that Plaintiff had with a single student and "made it their own." Dkt. No. 24-17.

## C. Coordinator Training Program

On April 2, 2008, Plaintiff entered FLETC's Coordinator Training Program ("CTP"). Dkt. No. 24-4 ¶ 5. The CTP consisted of three (3), progressive phases. FLETC Training Officer John Huggins supervised Plaintiff in this program. Id. ¶ 6.

## D. Plaintiff's Second TDY to FLETC

In May 2008, Plaintiff and a fellow Firearms Instructor, Greg Murphy, applied to CBP for new TDYs to FLETC. Id. ¶ 1. At some unspecified time, Plaintiff's CBP supervisors at FLETC provided the following recommendation in support of Plaintiff's selection for the TDY:

AO 72A
(Rev. 8/82)

> [Plaintiff] has proven himself while on a
> previous TDY to Firearms at the Academy. He
> is a certified . . . Firearms Instructor,
> having successfully completed the required
> FLETC training. [Plaintiff] was rated
> exceptional in his overall performance for
> the past two years, has a strong work ethic
> and has a dedication and passion for
> instructing. He is highly recommended by
> his supervisors.

Dkt. Nos. 1 ¶ 44; 9 ¶ 44. In July or August 2008, CBP extended
Plaintiff's TDY to the FLETC Firearms Division. Dkt. No. 24-4
¶¶ 2, 3. Subsequently, Murphy's TDY application was rejected.
Id. ¶ 3.

On September 14, 2008, Plaintiff began his new TDY. Id.
¶ 4. Plaintiff also continued in the Coordinator Training
Program. Plaintiff's new TDY was scheduled to end in mid-
September 2009. Dkt. No. 24-19 ¶ 104; 24-20, at 26.

E. Magazine Pouch Placement Disagreement

By the summer of 2008, Plaintiff and Murphy disagreed about
the proper placement of magazine pouches. Dkt. Nos. 24-7, at

AO 72A
(Rev. 8/82)

24-25, 45; 24-15.  Murphy instructed students to wear their pouches horizontally.  Dkt. No. 24-15.  Huggins told Plaintiff to instruct students to wear their magazine pouches vertically. Dkt. No. 24-4 ¶ 30.  Plaintiff complied with Huggins's instruction.  Id. ¶ 30; Dkt. No. 24-15.

During the summer of 2008, Koran learned of this disagreement.  Dkt. No. 24-7, at 45; see also Dkt. Nos. 24-1 ¶ 127; 24-14 (noting that Murphy proposed lesson plan changes in early July).  He contacted the CBP Air Marine Branch in Washington, D.C.  Dkt. No. 18-3, at 24-25.  The Air Marine Branch confirmed that Murphy's instruction complied with agency policy while Plaintiff's instruction did not.  Id. at 24-25.

The CBP lesson plan and Huggins's instructions to Plaintiff contradicted CBP policy.  Specifically, an excerpt of a CBP lesson plan stated that the magazine pouch must be "placed upright" and not "inverted or sideways."  Dkt. No. 24-14 (dated October 3, 2008).  Also, Huggins stated on September 5, 2008, that Plaintiff complied with the "lesson plan in his instruction of the shooters."[4]  Dkt. No. 24-5.  Moreover, in an October 8,

_____

[4] On September 5, 2008, Huggins wrote a memorandum summarizing Plaintiff's completion of CTP Phase II and recommending his progression to Phase III.

11

2008, email, Koran wrote that it was acceptable to teach either
the horizontal or vertical magazine placement.  Dkt. No. 24-15.
Viewing these sources in Plaintiff's favor, his instruction on
magazine pouch placement was consistent with the CBP lesson
plan.[5]

F. Plaintiff Undermining Murphy

By the summer of 2008, Koran concluded that Plaintiff was
undermining Murphy and the effectiveness of Murphy's instruction
with the students.  Dkt. No. 18-3, at 26-27, 42-45.  Koran based
his conclusion on information that he learned from other
instructors, from Plaintiff's CTP supervisor, John Higgins, and
from Lead Instructor Jon Astor.  Id. at 43, 45.

G. EEO Mediation

On October 1, 2008, Plaintiff participated in an Equal
Employment Opportunity ("EEO") mediation session ("EEO
Mediation").  Dkt. No. 24-19 ¶ 40.  Specifically, Plaintiff

Dkt. No. 24-5.  In that memorandum, Huggins stated that Plaintiff had
"followed the lesson plan in his instruction of the shooters."  Id.
[5] Plaintiff suggests that there is a difference between CBP policy and the CBP
lesson plan.  Dkt. No. 24-1 ¶ 118.  The Court infers that Plaintiff's
instructions regarding pouch placement were consistent with the CBP lesson
plan but that those instructions were, perhaps, inconsistent with CBP policy.

AO 72A
(Rev. 8/82)

served as representative for U.S. Fish and Wildlife Service employee, Kathy Korte. Dkt. Nos. 18-18, at 2; 24-4 ¶ 10. Plaintiff and Korte were dating at the time.[6] Dkt. No. 24-20, at 92.

The basis of the mediation was Korte's allegation that Koran discriminated against her during her progression as a Firearms Instructor. Dkt. Nos. 18-18, at 2; 24-4 ¶ 10. The only people present at the EEO Mediation were Plaintiff, Korte, Koran, and the EEO mediator. Dkt. No. 24-19 ¶ 41. Plaintiff's involvement in the EEO Mediation was kept confidential. Dkt. No. 18-18, at 6.

In the mediation session, Plaintiff "respectfully" challenged Koran's conduct towards Korte, specifically noting that Koran's conduct was inappropriate. Dkt. No. 24-4 ¶ 11. Koran became visible angry. Id. ¶ 12. The mediator required the parties to take a break to "cool off." Id. ¶ 13. After the break, Koran remained visibly angry with Plaintiff. Id. ¶ 14.

---

[6] Korte is now Plaintiff's wife. Dkt. No. 24-19 ¶ 40. Plaintiff and Korte married on July 31, 2009, after the events at issue in this case. Id.

13

During this mediation, Plaintiff praised Huggins, stating that he was the best training officer at FLETC. Dkt. No. 24-7, at 52.

## H. CTP Evaluations

From April to October 2008, Plaintiff's CTP supervisor, Huggins, regularly completed "New Instructor Evaluation Sheets" pertaining to Plaintiff's job performance. Dkt. No. 24-19 ¶ 44.

### 1. Performance Evaluations: April 2 - October 8, 2008

During CTP Phases I and II, Plaintiff received only favorable evaluations. Dkt. Nos. 24-4 ¶ 7; 24-18. On September 5, 2008, Huggins recommended that Plaintiff progress to CTP Phase III. Dkt. No. 24-5.

On October 7 and 8, 2008, Plaintiff received two (2) favorable evaluations from Huggins. Dkt. No. 24-19 ¶¶ 45-48. The October 8 evaluation stated that Plaintiff was "well on his way to becoming a certified lead instructor." Dkt. No. 24-18, at 14.

AO 72A
(Rev. 8/82)

On October 8, 2008, Plaintiff received a positive annual performance appraisal.[7]  Dkt. No. 24-19 ¶ 49.  On October 8, Koran signed this appraisal and wrote "Thanks!"  Dkt. Nos. 18-13; 24-19 ¶ 49.  On October 16, Allen signed this appraisal and wrote "Thanks for a good job!"  Dkt. Nos. 18-13; 24-19 ¶ 50.

2.    Performance Evaluations:  October 9 – October 22, 2008

On October 9, 2008, Huggins's demeanor toward Plaintiff changed from very positive to very negative without any corresponding change in Plaintiff's performance or attitude.  Dkt. No. 24-4 ¶¶ 19, 22.  Specifically, Huggins "became personally antagonistic toward [Plaintiff], was orally critical of [Plaintiff's] job performance, and interrupted [Plaintiff's] lectures."  Id. ¶ 20.

From October 9 until October 22, Huggins was present for only three (3) of Plaintiff's CTP classes.  Id. ¶ 15.  During those classes, Huggins and Plaintiff were often separated by a concrete wall.  Id. ¶ 16.  When separated by the wall, Huggins could not observe Plaintiff's job performance.  Id. ¶ 17.

_____

[7] This appraisal related to Plaintiff's first TDY and not his CTP performance. Id. ¶ 49.

15

Consequently, Huggins observed Plaintiff for no more than forty-five (45) minutes from October 9 until October 22. Id. ¶ 18. During this time period, Huggins provided oral criticisms to Plaintiff. See id. ¶ 20-21. Huggins did not indicate that these criticisms were based upon reports from other instructors. Id. ¶ 21.

On October 22, 2008,[8] Huggins prepared an evaluation of Plaintiff's performance.[9] See Dkt. No. 24-18, at 15. The evaluation contained several criticisms. See id. Specifically, Huggins noted that Plaintiff's "lectures [we]re becoming disjointed" and that Plaintiff seemed "unprepared or preoccupied on other things." Id. Huggins's evaluation also described an October 20 incident wherein Plaintiff's brief failed "to cover all of the steps to do at the 25 yard line phase." Id. The evaluation also described Plaintiff telling students that there were two (2) methods of "mag exchanges" yet only describing one (1) of those methods. Id. Huggins's evaluation stated that Plaintiff failed to talk the shooters step-by-step through a

_____

[8] Sometime on October 22, 2008, Plaintiff sought out Lead Instructor Jon Astor. Dkt. No. 18-18, at 8. Plaintiff told Astor that Plaintiff could "no longer work with Huggins" and that "Huggins [wa]s out to get [him]." Id.
[9] When completing his evaluation, Huggins had no knowledge of Plaintiff's participation in the EEO Mediation. Dkt. No. 18-11, at 55.

16

task and that such failure denied the "line instructors time to correct the shooters on properly doing mag exchanges." Id. Huggins's evaluation also noted that several instructors stated that Plaintiff's "coming out of the tower to coach 'their' 6-shooters" created a "big distraction."[10]  Id.  Plaintiff asserts that these criticisms were not true.  Dkt. No. 24-4 ¶ 24.

3.    Delivery of the October 22 Evaluation

On October 23, 2008, Plaintiff was on duty as instructor at the Firearms range.  Dkt. Nos. 24-3, at 30; 24-20, at 107.  He was preparing for his 7:30 a.m. class.  Dkt. No. 24-20, at 107. At 7:25 a.m., Huggins came to the range and presented Plaintiff with the October 22 evaluation.  Dkt. No. 24-4 ¶ 23.  Huggins appeared to be nervous.  Dkt. No. 24-20, at 107.

Plaintiff challenged the evaluation's contents.[11]  Id. at 107-08.  In response, Huggins said that other instructors had complained about Plaintiff.  Id. at 107.  Plaintiff asked who those instructors were.  Id.  Huggins said that Murphy told him

_____

[10] Huggins testified that he saw Plaintiff do this.  Id. at 22-23.
[11] Huggins noted that, upon receiving the performance evaluation, Plaintiff became "extremely agitated."  Id. at 27-28.  Plaintiff alleged that Huggins was "out to get him."  Id.  Plaintiff also alleged that Huggins was part of a conspiracy against Plaintiff.  Id.

17

that Plaintiff had been "screwing up." Dkt. No. 24-4 ¶ 26.

Plaintiff told Huggins that, if Murphy was making untrue statements about Plaintiff, "Murphy was likely doing so because he was bitter about (i) having lost out to [Plaintiff] on the one-year TDY; (ii) having failed out of pilot school; and (iii) [Plaintiff's] disagreement with [Murphy] on the placement of the magazine pouch." Id. ¶ 25.

Huggins demanded that Plaintiff review and sign the evaluation immediately. Dkt. No. 24-20, at 107. Instead of signing, Plaintiff stated that he and Huggins needed to meet later. Id. at 107, 124. Huggins became angry. Id. at 124. He stated that he was removing himself as Plaintiff's training officer. Id. Huggins wrote on the evaluation that Plaintiff refused to sign it. See Dkt. No. 24-18, at 15.

The October 22 evaluation was the only evaluation that Huggins presented to Plaintiff immediately before a class at the range. Dkt. Nos. 24-3, at 28; 24-20, at 106. All prior evaluations had been presented at a mutually convenient time and place, such as in an office, after class, or during a lunch break while Plaintiff set up for an afternoon class. Id.

18

Huggins could have presented the evaluation to Plaintiff after his class or on the following day.[12]  Dkt. No. 24-4 ¶ 27.

### 4.  Huggins's Post-Delivery Actions

Sometime after leaving the range,[13] Huggins informed Koran of Plaintiff's negative reaction to his most recent performance evaluation.  Dkt. No. 18-3, at 58.

Also after leaving the range, Huggins informed Murphy of Plaintiff's negative reaction to his most recent performance evaluation.  Dkt. No. 24-10, at 1.  Huggins told Murphy that Plaintiff immediately became very agitated and began accusing Huggins and Murphy of conspiring to undermine Plaintiff's efforts with his CBP 811 class and to have Plaintiff removed from the Firearms Division.  Id.  Huggins also said that Plaintiff called Murphy a liar who had ulterior motives for being sent to FLETC from the field.

At 10:45 a.m. on October 23, 2008, Murphy went to Huggins's office.  Id. at 3.  Huggins told Murphy that Plaintiff refused

---

[12] Huggins maintains that he came to the range before Plaintiff's class because he and Plaintiff were not scheduled to be in the same class "for a period of two or three days."  Dkt. No. 24-3, at 29.
[13] The exact date and time of this meeting is unclear.  See Dkt. No. 18-3, at 58.

AO 72A
(Rev. 8/82)

to sign his performance evaluation.  Id.  Huggins also said that Plaintiff continued to defame Murphy and Huggins.  Id.

## I. Plaintiff-Murphy Incident

Plaintiff and Murphy worked across the hallway from one another.  See Dkt. Nos. 18-15; 24-20, at 125.  On October 23, 2008 at approximately 11:00 a.m., Plaintiff saw Murphy enter his office.  Dkt. No. 18-15; see also Dkt. No. 24-10, at 3. Plaintiff called across the hallway, "Have you received your departure date yet?"[14]  See Dkt. Nos. 18-15, 24-11.  Murphy entered Plaintiff's office, noticed that Plaintiff's officemate was present, and stated that Plaintiff and Murphy needed to talk outside.  Dkt. No. 24-11.  Plaintiff's officemate noted that Murphy's statement that the two (2) men needed to talk outside, "wasn't a request."  Id.  Plaintiff and Murphy went outside. They proceeded to argue.  Dkt. No. 24-20, at 133.

---

[14] Plaintiff maintains that he asked this question because he wanted to discuss changing classes with Murphy.  Dkt. No. 24-20, at 125-26.  Koran stated that Plaintiff asked the question to intentionally "needle" Murphy because Plaintiff received a TDY extension and Murphy did not.  Dkt. No. 24-7, at 30-31.  In essence, Plaintiff was "rubbing in" that Murphy was leaving. Id. at 24.  Koran believes that this question transitioned Murphy from "upset" to "angry."  Id. at 22, 25.

AO 72A
(Rev. 8/82)

An investigation into the incident began.[15]  Koran obtained

written statements of the incident from the participants and

several witnesses.  Dkt. No. 24-7, at 28-29, 31.

1.  Participant Statements

On October 24, 2008, Plaintiff submitted a written

statement describing the altercation with Murphy.  See Dkt. No.

18-15.  Plaintiff's statement noted that Murphy yelled at

Plaintiff, used profanity, and made threatening physical

gestures toward Plaintiff.  Id. at 1.  Plaintiff stated that he

kept his hands in his pockets at all times and never raised his

voice.  Id.  Plaintiff stated that he feared that, "next time[,]

I may not be able to calm [Murphy] down before he goes

completely out of control and does great bodily harm to me."

Id. at 2.

On October 23, 2008, Murphy also submitted a written

statement describing the altercation.  Dkt. No. 24-10.  Murphy's

statement recalled Plaintiff blaming Huggins for turning Murphy

against Plaintiff.  Id. at 3.  Murphy also said that Plaintiff

---

[15] Koran stated that Allen conducted the investigation.  Id. at 19.  However, Allen asserted that he did not investigate the incident but was merely "cc'd" on emails based on his capacity as Plaintiff's supervisor.  Dkt. No. 24-8, at 15-16, 21-22.

21

described his support of another staff member against her Agency.[16]   Id. at 4.   Murphy's statement described Plaintiff's hostile attitude and alienation of others through "constant complaints."   Id. at 5.   Murphy stated that Plaintiff "ha[d] become a disruptive factor within the Firearms Division."   Id.

Plaintiff asserts that Murphy's written statement was untrue.   Dkt. No. 24-4 ¶ 28.

### 2.   Witness Statements

Several people witnessed the argument, including Timmey Dobbs (FLETC Instructor), Kennis Lastinger (FLETC contractor), Donald Savage (Senior Firearms Instructor), and John Williams (Firearms Instructor).   Korte also claimed to have witnessed the argument.   All witnesses provided written statements that relayed their observations.   See Dkt. Nos. 18-14, 18-17.

Dobbs noted that both men were in an agitated state with raised voices.   Dkt. No. 18-14, at 1.   Dobbs also recalled that Murphy gestured with his arms and hands.   Id.   Dobbs did not see other witnesses.   Id.

---

[16] Murphy was not involved with the October 2008 EEO Mediation.   Dkt. No. 24-19 ¶ 59.   Murphy had no reason to be angry with Plaintiff for participating in the EEO Mediation.   Id.   Murphy's negative statements toward Plaintiff were not based on Plaintiff's involvement with the EEO Mediation.   Id. ¶ 60.

AO 72A
(Rev. 8/82)

Lastinger was approximately one hundred (100) feet from Plaintiff and Murphy during their alteration. Dkt. No. 18-16, at 6. Lastinger noted that the men had red faces. Id. He also noted that one (1) of them shook his finger. Id. Lastinger saw no one other than the two (2) men. Dkt. No. 18-14, at 4. He specifically stated that Korte was not present. Id.

Savage noted that the discussion was heated and "somewhat loud." Id. at 2. Before Savage could approach the two (2) men, Murphy held up his hands "in what looked like a calming or surrender[ing] gesture and both [men] seemed to calm down." Id. Savage saw two (2) other witnesses, Barrington and Williams. Id.

Williams was approximately thirty-five (35) feet from Plaintiff and Murphy during their alteration. Dkt. No. 24-12, at 13. Williams noted that there were hand gestures but that those gestures "did not appear to be threatening in nature." Dkt. No. 18-14, at 3. Williams did not observe loud speech or foul language that "would attract [one's] attention." Id. He did not see Korte during the altercation. Id.; Dkt. No. 24-12, at 14.

Korte asserted that she witnessed the argument. See Dkt. No. 18-17. She was approximately sixty (60) feet from Plaintiff

AO 72A
(Rev. 8/82)

and Murphy during their altercation. Dkt. No. 18-17. She observed Plaintiff "standing with his hands in his pockets talking in a low voice." Id. She observed Murphy speaking loudly and moving his hands in a threatening manner. Dkt. No. 24-19 ¶ 81. She said that "Murphy's body language indicated a very agitated state" and that his "actions were that of someone out of control of his emotions." Dkt. No. 18-17.

### 3. Investigator's Conclusion

Koran reviewed all of the written statements as part of his investigation into the altercation. Dkt. Nos. 18-3, at 32-33; 24-7, at 56-57. After his investigation, Koran concluded that "a good majority" of Plaintiff and Korte's statements were "embellished" and "not factual." Dkt. No. 18-3, at 31, 33; see also Dkt. No. 18-18 (concluding that Plaintiff "embellished and/or provided incorrect facts to present himself in a favorable position"). To reach this conclusion, Koran credited that no witnesses saw Korte during the altercation. Dkt. No. 18-3, at 34-35. Koran also noted that Plaintiff and Korte's statements were "very similar in nature as if they were corroborating as they were writing their . . . statements." Id. at 35. The extent to which Korte's statement differed from

24

other witnesses' statements, combined with Korte's personal and romantic relationship with Plaintiff, caused Koran to "seriously question [Korte's] credibility, veracity and recollection of the events." Dkt. No. 18-18, at 8.

Koran also concluded that "Murphy did not verbally abuse, physically threaten and/or provide[] incorrect facts to present himself in a favorable position." Dkt. No. 18-18. "From all the facts," Koran ultimately determined that Plaintiff was "undermining . . . Murphy and undermining the effectiveness of the instruction with the students." Dkt. No. 18-3, at 27.

## J. Plaintiff's TDY Termination

On October 29, 2008, Koran terminated Plaintiff's TDY. Dkt. No. 24-1 ¶ 5. On October 30, CBP personnel notified Plaintiff that his TDY was terminated. Dkt. No. 18-18, at 10-11.[17] On October 31, Plaintiff out-processed from FLETC and the CBP Academy. Id. at 10.

---

[17] On October 31, 2008, Plaintiff went to Koran's office to inquire into the reasons for his termination. Dkt. No. 24-20, at 174. Without providing an explanation, Koran told Plaintiff to get of his office. Id.

AO 72A
(Rev. 8/82)

K. <u>Post-Termination Events</u>

On November 5, 2008, Plaintiff returned to FLETC. <u>Id.</u> He approached several FLETC students. <u>Id.</u> Those students became concerned and reported Plaintiff's behavior to Murphy. <u>Id.</u> Murphy reported the incident to FLETC authorities. <u>Id.</u> Thereafter, Plaintiff was banned from entering FLETC. <u>Id.</u>; Dkt. No. 18-19.

On November 18, 2008, Plaintiff filed a formal EEO administrative complaint of discrimination with the Department of Homeland Security. Dkt. No. 24-19 ¶ 106.

CBP gave Plaintiff permissive detail to Florida so that Plaintiff could be near his ill father. <u>Id.</u> ¶ 100. After Plaintiff's father died, CBP sent Plaintiff back to his regular duty station in San Diego, California. <u>Id.</u> ¶ 101.

Plaintiff retained his GS-13 pay grade until September 27, 2009. <u>Id.</u> ¶ 103.

L. <u>Koran's Decision to Terminate Plaintiff's TDY</u>

On April 1, 2009, Koran signed a statement related to the investigation into Plaintiff's EEO complaint. <u>See</u> Dkt. No. 18-18. In his statement, Koran noted that he recommended terminating Plaintiff's TDY based on (1) the Plaintiff-Murphy

investigation and (2) prior student complaints.  Id. at 10.

Koran concluded that Plaintiff's "repeated unprofessional

conduct was not conducive to the effective training of CBP

trainees or the harmonious interaction of the firearms

instructor cadre to include CBP, FLETC and other . . . staff

members."  Id.  Koran noted that "the efficiency of training for

the CBP . . . classes was being negatively affected."  Id.

Koran further asserted that he recommended terminating

Plaintiff's TDY based on Plaintiff's "unprofessional conduct and

disruptive behavior involving students and staff."  Dkt. No. 18-

18, at 11-12.

On June 26, 2012, Koran was deposed for the instant suit.

See Dkt. Nos. 18-3; 24-7.  In his deposition, Koran noted six

(6) reasons for his October 29 recommendation to terminate

Plaintiff's TDY.  First, Plaintiff received negative student

evaluations dating back to September 2007.  Dkt. No. 18-3, at

42.  Second, animosity persisted between Plaintiff and Murphy,

and Plaintiff undermined Murphy in the classroom.  Id.  Koran's

investigation revealed that Plaintiff caused most of the

animosity by "undermining Murphy in the classroom and . . .

talking about Murphy's lack of ability . . . as a pilot."  Id.

at 42-43.  To reach this conclusion, Koran relied on his

27

investigation into the October 23 altercation. Id. at 43. He also relied on input from Huggins, Astor, and other instructors. Id. Those instructors indicated that Plaintiff "was undermining Mr. Murphy and undermining the efficiency of the training class." Id. Third, Koran could not substantiate Plaintiff's version of the October 23 incident with Murphy. Id. at 44. Fourth, Plaintiff deviated from CBP policy with respect to the placement of magazine pouches. Id. at 45. Koran noted that Plaintiff undermined Murphy as relates to this issue because Plaintiff went "directly to the students" to discuss his disagreement with Murphy's instruction as to pouch placement. Id. at 45. Fifth, Plaintiff reacted poorly to Huggins's delivery of the October 22 performance evaluation. Id. at 52. Sixth, Plaintiff repeatedly asserted that "everyone was conspiring to get him." Id.

Koran stated that he based his decision on a "culmination of events" going back to 2007. Id. at 42. However, if no other negative events had occurred after Plaintiff received the negative student evaluations in September 2007, Koran probably would not have terminated Plaintiff's TDY. Id. at 53.

AO 72A
(Rev. 8/82)

M. Murphy's TDY

Koran considered terminating Murphy's TDY. Id. at 46. He did not do so because he could not determine whether Murphy participated in any wrongdoing. Id. Moreover, Murphy received no negative student critiques accusing him of racial animosity. Id. at 54. He did not allege that others were conspiring against him. Id. Nor did he "blow up" at his supervisor for relaying constructive criticism. Id.

II. **PROCEDURAL BACKGROUND**

A. Plaintiff's Administrative Complaint

On November 18, 2008, Plaintiff filed a formal Equal Employment Opportunity Commission ("EEOC") administrative complaint of discrimination against the Department of Homeland Security. Dkt. No. 24-19 ¶ 106. In his complaint, Plaintiff alleged that his TDY was terminated in retaliation for his participation in the EEO Mediation. Id. ¶ 107.

On September 6, 2011, Plaintiff's retaliation claim was denied. Id. ¶ 108. Specifically, the EEOC's Administrative Judge concluded that Plaintiff failed to prove that he was subjected to retaliation. Id.

AO 72A
(Rev. 8/82)

B. Plaintiff's Pending Complaint

Plaintiff brought his Complaint in this Court on December 1, 2011. See Dkt. No. 1. Plaintiff alleges that Koran terminated Plaintiff's TDY in retaliation for his participation in the EEO Mediation. Dkt. No. 1 ¶ 119. Plaintiff seeks reinstatement to his TDY, compensatory damages, and attorney's fees. Dkt. No. 1.

Currently before the Court is Defendant's Motion for Summary Judgment on all claims. See Dkt. No. 18. This motion has been fully briefed. See Dkt. Nos. 24, 26, 28, 29.

## III. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute over such a fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination,

AO 72A
(Rev. 8/82)

the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

**III. DISCUSSION**

Plaintiff alleges that Koran terminated his TDY in retaliation for Plaintiff's participation in the October 1, 2008, EEO Mediation. See Dkt. No. 1. Plaintiff asserts that Koran's alleged retaliation violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII"). See id. Defendant asserts that Plaintiff's

31

claim fails as a matter of law. The Court agrees. For the reasons stated below, Defendant's motion for summary judgment on Plaintiff's claim of retaliatory termination in violation of Title VII is **GRANTED.**

A. Legal Standard

Title VII prohibits employers from retaliating against an employee because "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [42 U.S.C. § 2000e-3]." 42 U.S.C. § 2000e-3(a).

"To establish a prima facie case of retaliation, the plaintiff must show that (1) [he] engaged in statutorily protected activity; (2) [he] suffered a materially adverse employment action; and (3) there was a causal link between the two." Gowski v. Peake, 682 F.3d 1299, 1311 (11th Cir. 2012) (citing Dixon v. The Hallmark Companies, Inc., 627 F.3d 849, 856 (11th Cir. 2010)) (footnote omitted). "These three elements create a presumption that the adverse action was the product of an intent to retaliate." Bryant v. Jones, 575 F.3d 1281, 1308 (11th Cir. 2009). "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the

AO 72A
(Rev. 8/82)

adverse action were not wholly unrelated." Thomas v. Miami

Veterans Med. Ctr., 290 F. App'x 317, 320 (11th Cir. 2008)

(citation omitted). "Discrimination is about actual knowledge,

and real intent, not constructive knowledge and assumed intent."

Thomas, 290 F. App'x at 320 (citing Walker v. Prudential Prop. &

Cas. Ins. Co., 286 F.3d 1270, 1274 (11th Cir. 2002)).

Therefore, the Court "must focus on the actual knowledge and

actions of the decision-maker." Id. at 320 (citing Walker, 286

F.3d at 1274).

"Once a plaintiff establishes a prima facie case of

retaliation, the burden of production shifts to the defendant to

rebut the presumption by articulating a legitimate, non-

discriminatory reason for the adverse employment action."

Bryant, 575 F.3d at 1308 (citation omitted). "If the defendant

carries this burden of production, the presumption raised by the

prima facie case is rebutted . . . and drops from the case."

Id. at 1308 (citing Texas Dept. of Cmty. Affairs v. Burdine, 450

U.S. 248, 255, 255 n.10 (1981)).

If the defendant produces evidence to rebut the presumption

of retaliation, the plaintiff must "show that the [defendant's]

proffered reasons for taking the adverse action were actually a

pretext for prohibited retaliatory conduct." McCann v. Tillman,

33

526 F.3d 1370, 1375 (11th Cir. 2008) (citing Sullivan v. Nat'l
R.R. Passenger Corp., 170 F.3d 1056, 1059 (11th Cir. 1999)).
The "[p]laintiff can demonstrate pretext by showing that the
[defendant's] 'proffered reason was not the true reason for the
employment decision.'" Whitby v. Sec'y for Dept. of Homeland
Sec., 480 F. App'x 960, 964 (11th Cir. 2012) (quoting Burdine,
450 U.S. at 256). The "[p]laintiff can show this 'either
directly by persuading the court that a discriminatory reason
more likely motivated the [defendant] or indirectly by showing
that the [defendant's] proffered explanation is unworthy of
credence.'" Id. at 964 (quoting Burdine, 450 U.S. at 256).
Thus, the plaintiff must demonstrate "such weaknesses,
implausibilities, inconsistencies, incoherencies, or
contradictions in the [defendant's] proffered legitimate reasons
for its action that a reasonable factfinder could find them
unworthy of credence." McCann, 526 F.3d at 1375-76 (citing
Cooper v. Southern Co., 390 F.3d 695, 725 (11th Cir. 2004)).
"[A] reason is not pretext for discrimination 'unless it is
shown both that the reason was false, and that discrimination
was the real reason.'" Springer v. Convergys Customer Mgmt.
Grp. Inc., 509 F.3d 1344, 1349 (11th Cir. 2007) (quoting Brooks

34

v. Cnty. Comm'n of Jefferson Cnty., 446 F.3d 1160, 1163 (11th Cir. 2006)).

## B. Application

### 1. Plaintiff's Prima Facie Case

Defendant agrees, for the purposes of her motion, that Plaintiff established a prima facie case of retaliation. See Dkt. No. 18, at 12.

### 2. Defendant's Rebuttal

Defendant asserts six (6) reasons for Koran's decision to terminate Plaintiff's TDY. These reasons include:

> (1) The numerous negative student critiques lodged against Plaintiff during his tenure as a FLETC firearms instructor;
>
> (2) The continued animosity between Plaintiff and fellow firearms instructor Murphy, and Plaintiff's undermining of Murphy in the classroom;
>
> (3) The fact that Plaintiff's written statement regarding the October 23

AO 72A
(Rev. 8/82)

altercation with Murphy could not be
substantiated;

(4)  The fact that Plaintiff was not
adhering to CBP policy with regards to
the placement of magazine pouches;

(5)  Plaintiff's negative reaction to
Huggins's attempt to deliver his
instructor critique on October 23; and

(6)  Plaintiff's attitude that there was a
conspiracy against him.

Id. at 13.

Defendant carried her burden of production by supplying the
Court with evidence of each of these six (6) reasons.  See
Kondrak v. Principi, 161 F. App'x 817, 819 (11th Cir. 2005)
("The employer's burden is merely one of production, not
persuasion." (citation omitted)).

Each of the proffered reasons is a legitimate reason to
terminate an employee's detail.  None of these reasons relates
to Plaintiff's participation in the EEO Mediation.
Consequently, Defendant's articulation of these legitimate, non-
discriminatory reasons rebuts Plaintiff's prima facie case of
retaliation.  See Bryant, 575 F.3d at 1308.  Plaintiff appears

AO 72A
(Rev. 8/82)

to agree with this conclusion.  See generally Dkt. Nos. 24, 28

(arguing only that the proffered reasons are pretextual).

3.  Plaintiff's Assertion of Pretext

Plaintiff asserts that Defendant's proffered reasons for

terminating Plaintiff's TDY are pretextual.  Id.  Plaintiff

makes three (3) arguments.  First, Koran's reasons for the

termination "evolved."  Second, Koran based his decision on the

"combination" of all six (6) proffered reasons.  Thus, if any of

the six (6) proffered reasons is pretextual, Koran's entire

explanation is pretextual.  Third, all of the six (6) proffered

reasons are pretextual.

a. "Evolving" Explanations

Plaintiff asserts that Koran offered "markedly different"

reasons for his decision to terminate Plaintiff's TDY.  Dkt. No.

24, at 2-3.  Specifically, Plaintiff asserts that, on April 1,

2009, Koran had only two (2) reasons for his decision to

terminate Plaintiff's TDY.  Id.  Plaintiff further asserts that,

on June 26, 2012, Koran added four (4) new reasons for his

decision.  Id.  Plaintiff asserts that Koran's "evolving"

37

explanations are evidence of pretext.  Id.  This argument fails as a matter of law.

In his April 2009 statement, Koran explained that Plaintiff's "repeated unprofessional conduct was not conducive to the effective training of CBP trainees or the harmonious interaction of the firearms instructor cadre to include CBP, FLETC and other . . . staff members."  Dkt. No. 18-18, at 10. Koran also noted that "the efficiency of training for the CBP . . . classes was being negatively affected."  Id.  Koran further asserted that he recommended terminating Plaintiff's TDY based on Plaintiff's "unprofessional conduct and disruptive behavior involving students and staff."  Id. at 11-12.

In his statement, Koran specifically noted that he recommended terminating Plaintiff's TDY based on (1) the Plaintiff-Murphy investigation and (2) prior student complaints. Id. at 10.  In his explanation of the Plaintiff-Murphy incident,[18] Koran referred to his investigation into the October 23, 2008, incident between Plaintiff and Murphy.  Id. at 7-8. Koran stated his conclusions that "Murphy did not verbally

_____

[18] Koran's explanation refers the reader to "Question # 41."  Dkt. No. 18-18, at 10.  Therefore, the Court relies on Koran's response in Question #41.

AO 72A
(Rev. 8/82)

abuse, physically threaten and/or intimidate [Plaintiff]" and
that Plaintiff "embellished and/or provided incorrect facts to
present himself in a favorable position." Id. at 7. Koran's
explanation also discussed (1) Plaintiff's deviation from the
lesson plans and instructional procedures, (2) Plaintiff's
undermining of Murphy's instruction and qualifications with
students and instructions, (3) Plaintiff's poor reaction to
Huggins's October 22, 2008, evaluation, and (4) Plaintiff's
assertion that the Huggins and Murphy were conspiring against
him. Id. at 8.

In his explanation of the student complaints,[19] Koran
referred to students' repeated complaints about Plaintiff
"screaming, yelling and cursing." Id. at 5-6. Koran also
referred to complaints about Plaintiff's unprofessional and
demeaning comments. Id. Koran also noted that a student
expressed concern that Plaintiff may have racial issues with
Hispanics. Id.

Thus, Koran's April 1, 2009, explanations for terminating
Plaintiff's TDY are completely consistent with his July 26,

---

[19] Koran's explanation refers the reader to "Question # 27." Id. Therefore,
the Court relies on Koran's response in Question #27.

AO 72A
(Rev. 8/82)

2012, explanations. Consequently, Plaintiff assertion that Koran's explanations "evolved" is without merit.

### b. "Combination" of all Proffered Reasons

Koran stated that "a culmination of events" led to his decision to terminate Plaintiff's TDY. Dkt. No. 24-7, at 42; see also id. at 43 ("[I]t wasn't one particular incident, but it was a culmination, a combination that again culminated and [the Plaintiff-Murphy] incident occurred."). Plaintiff argues that this statement means that "it was the cumulative effect of the six categories of alleged misconduct that caused him to terminate [Plaintiff's] detail." Dkt. No. 24, at 10; see also Dkt. No. 28, at 6. Plaintiff further argues that "every one of Koran's . . . 'explanations' must prove true for the Court to conclude that his six reasons are the real reasons for his termination decision." Dkt. No. 24, at 10; see also Dkt. No. 28, at 6 (arguing that "Koran's 'cumulative effect' explanation is not six separate reasons . . . [but] a single reason"). This argument fails as well.

First, Koran used the word "combination" one time. Dkt. No. 24-7, at 43. He did so in a longer explanation wherein he described his decision as being a "culmination." Id. Second,

Koran did not use the phrase "cumulative effect."[20]  Even assuming Koran's explanation for his termination decision was that he considered a combination of events, that does not lead to the conclusion that Koran required all six (6) proffered reasons to reach his decision.[21]  Quite to the contrary, Koran's explanation was that there were many factors leading to his decision.  Those factors "culminated" in Plaintiff's October 23 incident with Murphy and Koran's subsequent investigation into that incident.

Koran's statements are consistent with this conclusion. Specifically, Koran acknowledged that he probably would not have terminated Plaintiff's TDY if no other negative events had occurred after Plaintiff received the negative student evaluations in September 2007.  Dkt. No. 18-3, at 53.  Thus, it was Plaintiff's receipt of negative student evaluations combined with other factors that led to the termination of Plaintiff's TDY.  How many other reasons Koran needed to reach his ultimate

_____

[20] In his briefs, Plaintiff repeatedly states that Koran used the phrase "cumulative effect."  See, e.g., Dkt Nos. 24, at 6; 28, at 6-7.  However, the Court finds no use of this phrase in the cited pages of Koran's deposition. See Dkt. No. 28, at 6 (referring the Court to Dkt. No. 24-7, at 42-43, 52-53).
[21] The Court notes that Plaintiff points to no evidence wherein Koran stated or even reasonably indicated that he needed all six (6) reasons to terminate Plaintiff.

41

conclusion is unknown.  However, the evidence does not establish

that Koran required all of Plaintiff's negative actions to make

his decision.[22]

### c. Pretextual Nature of Each Proffered Reason

#### i. *Negative Student Critiques*

Defendant asserts that Koran based his decision to

terminate Plaintiff's TDY on Plaintiff's receipt of negative

student evaluations.  Dkt. No. 18, at 13.

Plaintiff received negative student evaluations in

September 2007, December 2007, and February 2008.  Koran only

knew about the September 2007 evaluations.

After an investigation into the September 2007 negative

evaluations, Allen told Plaintiff that "[he] did nothing wrong."

Dkt. No. 24-20, at 44.  Plaintiff asserts that Allen's statement

necessarily means that Koran could not have relied upon the

September 2007 evaluations when deciding whether to terminate

---

[22] The Court notes that many of the reasons occurred in rapid succession.
Specifically, four (4) proffered reasons occurred or repeated themselves on
or near October 23, 2008.  First, Plaintiff reacted poorly to Huggins's
delivery of the October 22 evaluation.  Second, Plaintiff accused Huggins and
Murphy of conspiring against him.  Third, Plaintiff and Murphy had their
public altercation, continuing their animus.  Fourth, Koran could not
substantiate Plaintiff's written statement regarding the October 23
altercation with Murphy.

AO 72A
(Rev. 8/82)

Plaintiff's TDY. Dkt. No. 24, at 7-8. The record, even viewed in the light most favorable to Plaintiff, shows otherwise.

First, Plaintiff did not point to evidence that disputes Allen's assertion that he provided Plaintiff with verbal counseling and a "verbal warning." Dkt. Nos. 18-7, at 9, 12-13; 24-8, at 11. Specifically, Allen asserted that he told Plaintiff that there would be "zero tolerance for the future." Dkt. Nos. 18-7, at 13; 24-8, at 11. Plaintiff provided no evidence that Allen failed to provide this warning.

Second, even if Allen did not warn Plaintiff that there would be "zero tolerance" for future problems, Koran was not required to forget that Plaintiff received these negative student critiques. The fact that Allen found no "hard evidence" of misconduct in September 2007 does not mean that Koran was required to ignore that the students made their negative evaluations. Nor does it means that Koran could not combine his recollection of the negative student evaluations with new reports of Plaintiff's negative actions to reach the conclusion that Plaintiff's TDY should be terminated.

Plaintiff also alleges that the students were "ganging up" on him by providing the negative evaluations. Dkt. No. 18-2, at 47, 62-63, 79. However, Plaintiff pointed to no evidence

43

showing that Koran had any knowledge that the students were acting in such a retaliatory fashion.  Thomas v. Miami Veterans Med. Ctr., 290 Fed. App'x 317, 320 (11th Cir. 2008) ("Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent.  When evaluating a charge of employment discrimination, . . . [the Court] must focus on the actual knowledge and actions of the decision-maker."  (quoting Walker, 286 F.3d at 1274)).  Without such evidence, the Court cannot credit Plaintiff's claim.

   *ii.  Animosity Towards and Undermining of Murphy*

  Defendant asserts that Koran based his decision to terminate Plaintiff's TDY on the continued animosity between Plaintiff and Murphy.  Dkt. No. 18, at 13.  Defendant also asserts that Koran based his decision on Plaintiff's undermining of Murphy in the classroom.  Id.

  Plaintiff argues that this reason is pretextual because Koran did not rely on it in his April 1, 2009 statement.  Dkt. No. 24, at 23.  That is incorrect.  Koran wrote in his statement that Plaintiff "began undermining Murphy's instruction and qualifications both with the students" and with other instructors.  Dkt. No. 18-18, at 8.

44

Plaintiff also argues that Koran's claim is "not credible because it is not supported by any evidence of any alleged pre-October 23 'animosity' or 'undermining.'" Dkt. No. 24, at 23. However, Plaintiff goes on to quote Koran's deposition, wherein Koran referred to the "continued animosity between [Plaintiff] and Murphy." Id. (quoting 24-7, at 42). Plaintiff also quotes Koran when he said that his "investigation revealed that most [of the animosity] was due to [Plaintiff's] undermining Murphy in the classroom and talking about his . . . lack of ability . . . as a flight deck officer." Id. (quoting 24-7, at 42-43). Moreover, Plaintiff quotes Koran's statement that he had knowledge of this animosity prior to October 23, 2008. Specifically, Koran stated that he heard of the animosity "a couple of months prior to [the October 23] incident." Id. at 24 n.12.

Notwithstanding Plaintiff's own references to Koran's statements that he was aware of the animosity between Plaintiff and Murphy prior to October 23, 2008, Plaintiff maintains that there is no evidence supporting Koran's claim of pre-October 23 animosity. Id. at 23. The Court disagrees. Plaintiff's brief undermines his argument. The evidence supports Koran's assertion that animosity existed between Murphy and Plaintiff.

45

Plaintiff presents no evidence to the contrary. In fact, Plaintiff points to supporting evidence.

Finally, Plaintiff asserts that, even if such animosity existed prior to October 23, Koran failed to act on it until after the EEO Mediation on October 1, 2008. Id. at 25. This is true. However, that does not support the conclusion that Koran's proffered reason is pretextual. It is quite to the contrary. Koran knew of ongoing animosity between Murphy and Plaintiff. On October 23, 2008, this animosity resulted in a public, verbal altercation between the men. Koran's decision to investigate and act upon such an extreme display of a dysfunctional working relationship was legitimate. Koran's decision to act only after the public altercation does not evidence a retaliatory motive. No evidence links Koran's decision to investigate the October 23 altercation with the October 1 EEO Mediation. Without such evidence, the Court cannot conclude that Koran's concerns regarding (1) the ongoing and escalating animosity between the men and (2) Plaintiff's undermining of Murphy were not the true reasons for his decision.

46

### iii. *Inability to Substantiate Plaintiff's Statement*

Defendant asserts that Koran based his decision to terminate Plaintiff's TDY on that fact that he could not substantiate Plaintiff's statement regarding the October 23 incident with Murphy. Dkt. No. 18, at 13. Plaintiff asserts that "Koran's claim is not credible." Dkt. No. 24, at 12. Specifically, Plaintiff asserts that Plaintiff and Korte's account of the incident is accurate. Id. at 12-21. Plaintiff further asserts that Koran had no basis to believe the Murphy's statement or the statement of the other witnesses. Id. Again, this argument must fail.

The Court acknowledges that Plaintiff's version of the incident with Murphy may be correct. However, that does not lead to the conclusion that Koran's interpretation of the evidence before him was incredible or made in bad faith. Koran provided many legitimate reasons for why he credited the explanations of Murphy and the other witnesses. For example, Koran credited that no witnesses saw Korte during the altercation. Dkt. No. 18-3, at 34-35. Koran also noted that Plaintiff and Korte's statements were "very similar in nature as if they were corroborating as they were writing their . . . statements." Id. at 35. Koran also considered Korte's

47

motivation given her personal and romantic relationship with Plaintiff.  Dkt. No. 18-18, at 8.

Plaintiff directed the Court to no evidence that Koran's explanations for his decision to credit Murphy's statement were false.  Without such evidence, the Court cannot conclude that Koran's proffered explanation was not the true reason for his decision.

### iv.  Non-Compliance with CBP Policy

Defendant asserts that Koran based his decision to terminate Plaintiff's TDY on Plaintiff's failure to comply with CBP policy with respect to placement of magazine pouches.  Dkt. No. 18, at 13.

Plaintiff argues that this reason is pretextual because Koran did not rely on it in his April 1, 2009, statement.  Dkt. No. 24, at 21.  That is incorrect.  Koran wrote in his April 2009 statement that "[Plaintiff] was deviating from the proscribed lesson plans and instructional procedures."  Dkt. No. 18-18, at 8.  Koran also noted Murphy's statement to Plaintiff that he "needed to follow policy and instructional guidelines." See id.

In the alternative, Plaintiff argues that "Koran's claim is untrue."  That is, Plaintiff asserts that his instruction

complied with CBP lesson plan. Dkt. No. 24, at 21. For the purposes of this Order, the Court agrees. See supra Part I.E. However, by Plaintiff's admission, there is a difference between complying with the lesson plan and complying with policy. See Dkt. No. 24-1 ¶ 118.

In her motion, Defendant stated that Koran's concern related to Plaintiff's non-compliance with CBP policy. Dkt. No. 18, at 13. Defendant showed that CBP policy required a different magazine placement than Plaintiff taught. Id. at 24-25. Plaintiff directed the Court to evidence that he complied with the CBP lesson plan. However, he did not point to evidence rebutting Defendant's evidence that Plaintiff's violated CBP policy. Nor did he direct the Court to evidence that Koran was aware that Plaintiff complied with CBP policy (assuming that Plaintiff did so). See Thomas, 290 Fed. App'x at 320 ("[The Court] must focus on the actual knowledge and actions of the decision-maker." (citation omitted)). Without such evidence, the Court cannot conclude that Koran's proffered explanation was not the true reason for his decision.

Finally, Plaintiff asserts that Koran's decision to call Washington, D.C. to determine CBP policy was a "sham." Dkt. No. 28, at 15. Plaintiff asserts that Koran could have more easily

49

spoken with Huggins, Allen, or Savage and that his failure to do so indicates a discriminatory intent. Dkt. No. 28, at 13-15. The Court disagrees. The evidence shows that Murphy and Plaintiff disagreed over placement of the magazine pouches for months. See Dkt. Nos. 24-7, at 45 (noting that Koran learned of the magazine pouch placement dispute in the summer of 2008); 24-15 (containing October 2008 emails regarding the magazine placement issue). Consequently, Koran's decision to determine CBP policy and end the ongoing dispute does not evidence a "sham." It evidences a desire to end an "ongoing feud" among employees and improve workplace harmony.

> *v.*    *Poor Reaction to Huggins's October 22 Evaluation*

Defendant asserts that Koran based his decision to terminate Plaintiff's TDY on Plaintiff's negative reaction to Huggins's delivery of the October 22 evaluation. Dkt. No. 18, at 13. Plaintiff argues that "Koran testified that he would not have terminated [Plaintiff's] detail in response to Reeve's reaction to Huggins' [sic] evaluation." Dkt. No. 24, at 26.

Plaintiff misstates Koran's testimony. Koran was asked, "Did you also consider the fact that when . . . Huggins tried to approach [Plaintiff] with a critique of his performance that [Plaintiff] began talking about conspiracy theories and kind of

50

blew up at his supervisor Mr. Huggins?" Dkt. No. 24-7, at 52.
Koran responded, "That is correct." Id.

Thus, Plaintiff cited testimony that is directly
contradictory to his own argument.[23] Because Plaintiff's
argument is unsupported by the record, Plaintiff failed to
present evidence indicating that Koran's proffered reason is
pretextual.

### vi. Conspiracy Allegations

Defendant asserts that Koran based his decision to
terminate Plaintiff's TDY on Plaintiff's assertion that others
were conspiring against him. Dkt. No. 18, at 13. Plaintiff
argues that Defendant's assertion is pretextual. Specifically,
Plaintiff argues that his agreement on April 2, 2008, that
conspiracy theories would not justify multiple negative
critiques was limited to negative student critiques. Dkt. No.
24, at 27 (citing Dkt. No. 18-10). Plaintiff further alleges
that his assertion in October 2008 that instructors were
conspiring against him did not fall within the terms of his
April 2008 agreement. Id.

---

[23] The Court assumes that Plaintiff misread this testimony.

Plaintiff is correct. However, Plaintiff has not presented evidence that Koran's articulated reason is pretext for discrimination. Specifically, Koran did not agree that he would not consider Plaintiff's continued assertions that people were conspiring against him. Notwithstanding Plaintiff's agreement to limit his own actions by signing the April 2008 statement, Koran retained his full right to evaluate Plaintiff's performance and reaction to constructive or negative evaluations. Koran exercised this right in October 2008.

Plaintiff directed the Court to no evidence that Koran's statement that he believed that Plaintiff accused Huggins and Murphy of conspiring against him was false. Without such evidence, the Court cannot conclude that Koran's proffered explanation was not the true reason for his decision.

4. Conclusion

Defendant successfully rebutted Plaintiff's prima facie case of retaliation by proffering legitimate, non-discriminatory reasons for Koran's decision to terminate Plaintiff's TDY. Plaintiff failed to establish that any of Defendant's proffered reasons were pretextual. First, Plaintiff failed to show that the proffered explanations were false. Second, Plaintiff did

not show that discrimination was the real reason for Koran's decision.  See Springer, 509 F.3d at 1349 ("[A] reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.'" (quoting Brooks, 446 F.3d at 1163)).  Consequently, Plaintiff's claim of discriminatory retaliation in violation of Title VII fails as a matter of law.[24]

## IV.  CONCLUSION

For the reasons stated above, Defendant is entitled to judgment as a matter of law.  Consequently, Defendant's Motion for Summary Judgment is **GRANTED**.  Dkt. No. 18.  The Clerk of Court is directed enter a final judgment and to close the case.

**SO ORDERED**, this 4th day of March, 2013.

_____
LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

_____

[24] The Court does not reach Defendant's alternative arguments related to mixed motive defense or nominal damages.  See Dkt. No. 18, at 20-21.

AO 72A
(Rev. 8/82)